1

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF WASHINGTON**

7

8  JEFFREY P. BERTELSEN and AMY L.     )
   BERTELSEN, husband and wife, and    )
9  the marital community comprised     )      No. CV-04-5135-LRS
   thereof; BERTELSEN FOOD & GAS,      )
   INC., a Washington corporation;     )      **FINDINGS OF FACT**
10 and DR. RICHARD BERTELSEN and       )      **AND CONCLUSIONS OF LAW**
   JANIS JO BERTELSEN, husband and     )
11 wife, and the marital community     )
   comprised thereof,                  )
12                                      )
           Plaintiffs,                  )
13                                      )
   v.                                   )
14                                      )
   ROGER K. HARRIS; ROGER K. HARRIS,   )
15 PC, an Oregon Professional          )
   Services Corporation; HARRIS BERNE  )
16 CHRISTENSEN, LLP, an Oregon         )
   Limited Liability Partnership; and  )
17 RONALD E. McPHERSON,                )
                                        )
18         Defendants.                  )
   ─────────────────────────────────── )

19

20                    **<u>FINDINGS OF FACT</u>**

21     1.  Jeff and Amy Bertelsen owned six ARCO branded gas stations

22 for a number of years in the 1990's and operated the stations through

23 their corporation, Bertelsen Food and Gas, Inc.  In December 2000,

24 Bertelsen Food & Gas, Inc., ceased to operate because it had no money

25 to pay ARCO for gasoline or to pay the other vendors who also stopped

26 providing products to the stations.  (Agreed facts.)


**1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2.  Jeff and Amy Bertelsen retained Kennewick attorney, William Hames to provide advice about filing for bankruptcy, both for them individually as well as for the corporation, Bertelsen Food & Gas, Inc.

3.  Jeff Bertelsen knew attorney Roger Mr. Harris had extensive legal experience in dealing with gas station franchises, and in lieu of immediately filing for bankruptcy, Jeff Bertelsen contacted Mr. Harris to see if Mr. Harris could assist the Bertelsens in trying to resurrect their relationship with ARCO, so they could attempt to start getting gas again from ARCO and could continue to run the stations as ARCO branded stations.

4.  Jeff and Amy Bertelsen signed a retainer agreement in March, 2001, agreeing to pay Mr. Harris' hourly rate.  (Agreed facts, Trial Exhibit 21.)

5.  Jeff and Amy Bertelsen received bills from Mr. Harris between March, 2001, and May, 2001, for the work he performed. (Agreed facts.)

6.  Jeff and Amy Bertelsen never objected to any of these bills for the work done or the amount charged during this period in the spring of 2001.  (Agreed facts.)

7.  It became clear during the spring of 2001 that ARCO had no interest in continuing a business relationship with Jeff Bertelsen or Bertelsen Food & Gas, Inc.

8.  The Bertelsens thought they would try to sell the six stations as a business solution.  In May, 2001, Jeff and Amy

///

**2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  Bertelsen requested that Mr. Harris and Mr. McPherson, an industry

2  consultant, try to find a buyer for the six stations.

3      9.  Jeff and Amy Bertelsen did not have the money to pay

4  additional hourly attorney fees or consulting fees as of May, 2001,

5  and asked if Mr. Harris and Mr. McPherson would work on a contingent

6  basis.

7      10.  Mr. Harris discussed the issue with Mr. McPherson to see if

8  Mr. McPherson would be willing to attempt to market these six gas

9  stations on a 1% contingency fee basis.

10     11.  Jeff and Amy Bertelsen signed the corporate resolution of

11  May 29, 2001.  (Agreed facts, Trial Exhibit 410.)

12     12.  The May 29, 2001, corporate resolution provided that Jeff

13  and Amy Bertelsen could terminate the agreement early if they wanted,

14  and pay the hourly rates of $150 for Mr. McPherson and $195 for Mr.

15  Harris.  (Trial Exhibit 410.)

16     13.  The term of the May 29, 2001, agreement was 90 days.

17  (Agreed facts, Trial Exhibit 410.)  Over the next 90 days, from May

18  29, 2001, until the end of August, 2001, no buyer for the six

19  stations was found.  (Agreed facts.)

20     14.  In late August, at the time the May 29, 2001 contingency

21  fee agreement was to expire, it was quite clear that the Bertelsens

22  were not going to obtain the $11 million minimum sales price.  At

23  that time, Jeff and Amy Bertelsen still wanted to try to market the

24  stations and they wanted to sign a new contingency fee agreement.

25     15.  Mr. Harris discussed with Jeff and Amy Bertelsen the fact

26  that the new agreement would be based upon a 1.5% contingency.

**3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

16.   The September 19, 2001, corporate resolution provided for the 1.5% contingency fee percentage to apply to the "gross value of any transaction entered into with third parties." (Trial Exhibit 70.)  It also provided for reimbursement of the out of pocket expenses of Mr. Harris and Mr. McPherson. (Trial Exhibit 70.)

17.   Just like the earlier May 2001, agreement, the September 2001, corporate resolution specifically retained Mr. Harris and Mr. McPherson and provided that, if the Bertelsens wanted to terminate either Mr. Harris or Mr. McPherson (or both) they could, but they would be responsible for the $150/ hour for Mr. McPherson and $195/ hour for Mr. Harris. (Trial Exhibit 70.)

18.   An oil company called Tesoro agreed to lease the six stations, paying a $1,000,000 option to purchase at preset prices that totaled $8.5 million. The Tesoro transaction also involved monthly lease  payments of more than $60,000. (Trial Exhibit 422.)

19.   This Tesoro lease - option to purchase transaction closed on October 31, 2001. (Agreed facts.)

20.   Various creditors of Bertelsen Food & Gas Inc., and Jeff and Amy Bertelsen would not agree to allow the Tesoro transaction to go forward unless the monthly rent was paid to a trust, as opposed to being paid directly to Jeff or Amy Bertelsen.

21.   A trust had to be established in order for the Tesoro transaction to go through. Mr. Harris therefore prepared the declaration of trust and collection account. (Trial Exhibit 98.)

22.   The monthly rent payments from Tesoro went directly into the trust account and payments were then made directly to the various

**4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1    creditors from that trust account on a monthly basis.  As provided in

2    the trust agreement, some of the excess funds left over each month

3    after payment of various creditors were used to help fund the defense

4    of Jeff and Amy Bertelsen, as well as Bertelsen Food & Gas, Inc., in

5    the pending ARCO lawsuit.

6       23.  Ultimately, Jeff and Amy Bertelsen requested that attorney

7    David Peterson replace Mr. Harris as trustee on this Tesoro trust and

8    the trust was then transferred to Mr. Peterson with the consent of

9    the various creditors.

10      24.  Without taking into account the annual rent from Tesoro,

11   which totaled approximately $750,000 per year, the 1.5% continency

12   was applied by Mr. Harris and Mr. McPherson to the $1 million option

13   payment and the $8.5 million option prices.  Jeff and Amy Bertelsen

14   received correspondence from Mr. Harris before the October 31, 2001,

15   closing, which showed this contingency fee.  (Agreed facts.)

16      25.  Jeff and Amy Bertelsen attended the closing on October 31,

17   2001, and signed the various closing documents.

18      26.  Jeff and Amy Bertelsen knew, as of October 31, 2001, that

19   the $142,500 fee was being paid to Mr. Harris and Mr. McPherson.

20   (Agreed facts.)

21      27.  At the October 31, 2001, closing, Jeff and Amy Bertelsen

22   did not pose any objections to this $142,500 fee and did not dispute

23   this 1.5% calculation.

24      28.  Jeff Bertelsen did not feel that Mr. McPherson did anything

25   improper and that Mr. McPherson earned his $70,000 of this $142,500

26   payment.

**5 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

29.    During the period May 29 to October 31, 2001, Mr. Harris and Mr. McPherson spent a significant amount of time putting together sales information, contacting potential buyers, traveling around the Pacific Northwest and conducting numerous conferences by telephone.

30.    Based on Mr. Harris' recollection of the work done during May 29, 2001, to October 31, 2001, the total hours spent was, on average, at least 80 hours per month, for a total of at least 400 hours.  Written billing records showing exact time spent by Mr. Harris no longer exist.

31.    Based on the 400 hours or more, at the rate of $195 per hour set out in the March 21, 2001, retainer agreement, the fee only, not including expenses, would have been at least $78,000.  The actual contingency fee, inclusive of expenses, paid on October 31, 2001, was $72,500.  Under the September 19, 2001, corporate resolution, the Bertelsens were obligated to pay the out of pocket expenses of Mr. McPherson and Mr. Harris, but they were never charged any such expenses.

32.    The total value of this Tesoro transaction to Jeff and Amy Bertelsen involved significant financial benefits.  There were initially six stations and Tesoro was required to pay $60,208.32 per month for the first five years of the lease from November, 2001, to November, 2006.

33.    The lease provided that Tesoro would have an option at the end of the fourth year to cancel any particular lease with one year advance notice in year three.  Tesoro cancelled the Clearwater and
///

Steptoe leases.    Jeff and Amy Bertelsen then sold those stations in 2005 for $1,850,000.

34.   The total annual rent from November, 2001, to November, 2005, was $2,890,000.   Rent from November, 2005, to November, 2006, will be $528,146.36 for a total of $3,418,147.30.   For a period of November, 2006, to November, 2011, the total rent will be $2,926,674.

35.   The rental income totals $6,344,888.50 through the ten year period of the lease to November, 2011.   Added to this amount is the $1,000,000 Tesoro paid in October, 2001, as well as the $1,850,000 Jeff and Amy Bertelsen obtained in the 2005 sale of the Clearwater and Steptoe stations, for a total of $9,194,888.50, exclusive of the value which remains in the stations still owned by Jeff and Amy Bertelsen.

36.   Based upon these calculations, the actual value of the Tesoro transaction to Jeff and Amy Bertelsen is more than $9,194,888.50 and may exceed $15 million.

37.   ARCO filed a lawsuit against Jeff and Amy Bertelsen, Bertelsen Food & Gas and Dr. and Mrs. Bertelsen in August, 2001. (Agreed facts.)   Dr. Bertelsen knew that Harris was representing Jeff Bertelsen in the ARCO lawsuit, so, after he was served with the ARCO complaint, he contacted Mr. Harris.

38.   Dr. Bertelsen had an initial meeting with Mr. Harris in September, 2001.   (Agreed facts, Trial Exhibits 59 and 60.)

39.   As of the time the ARCO complaint was filed, Jeff and Amy Bertelsen had no recollection of any personal guarantee signed by Dr.
///

**7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  and Mrs. Bertelsen, nor did Dr. and Mrs. Bertelsen recall signing any

2  guaranties.

3      40.  At the initial meeting in September, 2001, Mr. Harris

4  discussed potential conflicts that could arise in representing all

5  the Bertelsens and suggested to Dr. and Mrs. Bertelsen that they

6  confer with their own counsel to evaluate whether they should be

7  separately represented.

8      41.  Mr. Harris explained in September, 2001, the possible

9  conflict that might arise in the future if the Bertelsen family

10  clients did not agree upon a trial strategy or began "finger

11  pointing" at one another.

12      42.  The Bertelsen family agreed that, despite the potential

13  conflict, Mr. Harris would go forward and represent the family group

14  in the ARCO lawsuit.

15      43.  Dr. and Mrs. Bertelsen signed the retainer agreement of

16  September 7, 2001.  (Agreed facts, Trial Exhibits 59 and 60.)

17      44.  Mr. Harris sent another follow up conflict disclosure to

18  Dr. and Mrs. Bertelsen the next month on October 22, 2001.  (Trial

19  Exhibit 78.)

20      45.  In the October 22, 2001, letter, Mr. Harris recommended

21  that Dr. and Mrs. Bertelsen seek separate legal advice and confirmed

22  the recommendation to seek independent legal counsel had been

23  previously given.  (Trial Exhibit 78.)

24      46.  This letter of October 22, 2001, which was sent to Dr.

25  Bertelsen and Jeff Bertelsen (as the representative of Bertelsen Food

26  & Gas, Inc.) advised the Bertelsen family members to have this issue

**8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

of representation in the ARCO lawsuit reviewed by independent

counsel.  (Trial Exhibit 78.)

47.  Dr. and Mrs. Bertelsen signed the October 22, 2001 waiver

letter.  (Trial Exhibit 78.)

48.  Even though Mr. Harris had recommended that he retain

independent counsel at the time, Dr. Bertelsen decided not to do so.

49.  Dr. Bertelsen had the funds to hire a lawyer to review

these matters and, in fact, was being represented by two attorneys,

Colonel Betz and William Allen, during this same time frame.

50.  On October 29, 2001, Mr. Harris wrote another letter to all

the Bertelsen family members setting out the agreement as to how the

ARCO litigation would proceed and how it would be funded.  (Trial

Exhibit 82.)

51.  In this letter of October 29, 2001, Mr. Harris recommended

that each of the Bertelsens seek independent counsel in connection

with this ARCO litigation to be fully advised of their rights.

(Trial Exhibit 82.)

52.  Jeff and Amy Bertelsen, as well as Dr. and Mrs. Bertelsen,

signed an acknowledgment of this October 29, 2001, conflict

disclosure and recommendation to seek legal advice.  (Trial Exhibit

82.)

53. Throughout Mr. Harris' representation, Mr. Harris

recommended Dr. Bertelsen seek independent legal advice.

54.  Despite the potential conflict in representing the debtors

(Jeff and Amy) and the potential guarantors (Dr. and Mrs. Bertelsen),

Jeff Bertelsen never felt there was a time during the pendency in the

**9 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

ARCO litigation in which Mr. Harris failed to make an argument on behalf of Jeff and Amy Bertelsen because he was representing the entire family.

55.  Dr. Bertelsen was likewise unaware of any conduct by Mr. Harris during the representation of Mr. Harris that was detrimental in any way to Dr. Bertelsen, based on the fact that Mr. Harris was representing all the defendants, instead of just Dr. Bertelsen.

56.  Mr. Harris continually sent correspondence to Dr. Bertelsen, as well as Jeff and Amy Bertelsen, advising them of the status of the ARCO litigation and recommending they  seek independent counsel on various issues as they arose during the course of the ARCO litigation.  (Trial Exhibit 130.)

57.  Mr. Harris' pursuit of the PMPA defense in the ARCO litigation was the result of an informed judgment and was reasonable, despite the fact that the defense ultimately did not succeed on summary judgment.   Plaintiffs failed to prove any damages were caused by the assertion of the PMPA preemption affirmative defense.

58.  Dr. Bertelsen was advised by Mr. Harris throughout the ARCO litigation to review the law firm bills and contact him if he had any questions.   Dr. Bertelsen never contacted Mr. Harris to ask him any questions about any of the billings.

59.  Dr. Bertelsen never reviewed a bill from Mr. Harris and felt the amount charged was inappropriate.  (Agreed facts.)

60.  Neither Mr. Harris or his firm tried to hide anything from the Bertelsens with respect to expenses or payments made to experts in the ARCO litigation.

61.  Jeff and Amy Bertelsen have no dispute over the attorney fee bills Mr. Harris sent to them.

62.  There was no payment by Jeff and Amy Bertelsen for any of the attorney time or expenses of Mr. Harris in the defense of the ARCO lawsuit, nor was there any payment for time or expenses incurred pursuant to the May 29, 2001, corporate resolution.

63.  There is no evidence that Mr. Harris engaged in any unfair or deceptive billing conduct in his representation of Jeff and Amy Bertelsen during the course of the ARCO litigation.

64.  Dr. Bertelsen told the IRS in his 2002 tax filing that Dr. Bertelsen was an owner of Bertelsen Food & Gas and "materially participated" in the operation of that business in 2002 and that Bertelsen Food & Gas paid $80,000 in attorney fees.  (Trial Exhibit 472.)

65.  In September, 2002, Amy Bertelsen told Mr. Harris that her husband had paid a $3,000 "kickback" to a vendor, Dale Cole, to generate a false invoice, which Jeff Bertelsen used to obtain approximately $178,000 of funding from ARCO for work that was never intended to be done.

66.  After hearing this from Amy Bertelsen, Mr. Harris approached Jeff Bertelsen and Jeff Bertelsen did not deny this had occurred.

67.  In October, 2002, while Mr. Harris was attempting to negotiate a settlement with ARCO's attorney, the Bertelsen family members began taking conflicting positions with respect to settlement.  (Trial Exhibit 459, 464.)  Jeff and Amy Bertelsen

**11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1  claimed they had no cash to contribute to a settlement with ARCO and

2  Dr. Bertelsen was not willing to contribute sufficient cash out of

3  his own pocket to fund the settlement.  (Trial Exhibit 464.)

4      68.  Although Jeff and Amy Bertelsen had earlier signed

5  indemnity agreements with Dr. and Mrs. Bertelsen, agreeing that they

6  would indemnify Dr. and Mrs. Bertelsen for all attorney fees paid and

7  all amounts paid in settlement, in October, 2001, Amy Bertelsen

8  wanted to be relieved of any such indemnity obligation.  (Trial

9  Exhibit 464.)

10     69.  The position by the Bertelsen family members and the

11  "kickback" disclosure caused Mr. Harris to conclude that he had to

12  withdraw from representation of the Bertelsens.

13     70.  Mr. Harris contacted the Oregon State Bar Association and

14  talked to ethic's counsel, who confirmed his decision to resign as

15  counsel for the Bertelsens.

16     71.  Even though Mr. Harris again recommended that all the

17  Bertelsens seek new counsel at the time of the withdrawal, they

18  decided not to retain new counsel.  Dr. Bertelsen felt that he might

19  have a better chance of settling with ARCO once Mr. Harris withdrew.

20     72.  After Mr. Harris withdrew, Jeff Bertelsen dealt directly

21  with attorney Doug Berry, who represented ARCO.  (Agreed facts.)

22     73.  After Mr. Harris withdrew, a draft settlement proposal was

23  prepared by Doug Berry, and at that point Dr. Bertelsen retained an

24  attorney, Bruce Smith, to review the settlement. (Agreed facts.)

25     74.  Attorney Smith advised Dr. Bertelsen to go ahead and sign

26  the settlement with ARCO.  (Agreed facts.)

12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

75. After Mr. Harris withdrew, Dr. and Mrs. Bertelsen settled with ARCO for a payment of $225,000. (Agreed facts.)

76. Jeff and Amy Bertelsen also settled with ARCO after Mr. Harris withdrew. Jeff and Amy Bertelsen ultimately paid $550,000 in 2005 for a release of the ARCO claims and judgment. (Agreed facts.)

77. Dr. Bertelsen received $35,000 in reimbursement from the $80,000 paid, so the net unreimbursed attorney fees and expenses is $45,000. (Agreed facts.)

### CONCLUSIONS OF LAW

1. The corporate resolution of May 29, 2001, was not a "modification" of the earlier March 21, 2001, hourly retainer agreement. Rather, the March hourly retainer agreement concerned Mr. Harris' work in trying to resurrect the Bertelsen's business relationship with ARCO. The May 29 corporate resolution dealt with the potential sale of the six gas stations through the efforts of Mr. Harris and Mr. McPherson.

2. Even if the May 29, 2001, corporate resolution was considered a "modification" of the March 21, 2001, retainer agreement, the May 29 agreement was fair and reasonable and was signed by Jeff and Amy Bertelsen, as well as Bertelsen Food & Gas, after full disclosure of all the relevant facts, based on the standards set out in Ward v. Richards & Rizanno, Inc., 51 Wn.App. 423, 754 P.2d 120 (1988).

3. The May 29, 2001, corporate resolution expired on its own terms on or about August 27, 2001. No payment was ever made to Mr. Harris pursuant to the May 29, 2001 corporate resolution.

4.   The September 19, 2001 corporate resolution is not a "modification" of the May 29, 2001 corporate resolution because the May 29 corporate resolution had already expired on its own terms approximately three weeks before the September 19, 2001 corporate resolution was signed by Jeff and Amy Bertelsen as well as Bertelsen Food & Gas, Inc., and was fair and reasonable.   Further, even if the September 19, 2001 corporate resolution was considered a "modification" of either the March 21, 2001, hourly retainer agreement or the May 29, 2001 corporate resolution, it was nonetheless fair and reasonable, made after full disclosure and free of undue influence based on the standards set out in <u>Ward v. Richards & Rizanno, Inc.</u>, 51 Wn.App. 423, 754 P.2d 120 (1988).

5.   The only payment to Mr. Harris or to his law firm pursuant to the September 19, 2001 corporate resolution was the payment of $72,500 pursuant to the closing of the Tesoro transaction which occurred on October 31, 2001.   That payment was reasonable and there was no breach of fiduciary duty or egregious misconduct by Mr. Harris in receiving that payment.   Further, based on the number of hours Mr. Harris had worked on the project on a contingent basis, if Jeff and Amy Bertelsen had elected to pay Mr. Harris' reasonable hourly rate of $195 an hour, the amount they probably would have paid Mr. Harris would have exceeded the $72,500 payment.

6.   Jeff and Amy Bertelsen, as well as Bertelsen Food & Gas, Inc., knew of the basis for the payment and knew of the payment itself as of October 31, 2001.   Even if they had a valid breach of fiduciary duty claim, any such claim was barred by the applicable three year statute of limitations, RCW 4.16.080.   The statute of

14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  limitations was not extended by the discovery rule or the continuous

2  representation rule, even if those rules apply to a breach of

3  fiduciary duty cause of action.

4    7.  Mr. Harris did not breach any fiduciary duty or engage in

5  any egregious misconduct in his representation of the Bertelsen

6  family members in the ARCO lawsuit.  The potential conflict of

7  interest at the outset of the ARCO litigation was waived by the

8  clients.

9    8.  Mr. Harris did not favor one client over the other during

10  his representation of the Bertelsen family members during the course

11  of the ARCO lawsuit.  Further, Mr. Harris continually advised the

12  Bertelsen family members to seek independent counsel.

13    9.  As to Jeff and Amy Bertelsen, they are not entitled to any

14  fee disgorgement with respect to Mr. Harris' work on the ARCO lawsuit

15  for a number reasons.  Jeff and Amy Bertelsen have not shown that Mr.

16  Harris engaged in any egregious misconduct in his representation of

17  Jeff and Amy Bertelsen, as well as Bertelsen Food & Gas, Inc., in the

18  ARCO lawsuit.

19    10.  Dr. and Mrs. Bertelsen's claim is $45,000.  A significant

20  portion of that payment did not go to Mr. Harris for his attorney

21  fees, but rather was paid to various third parties, including

22  experts, court reporters and payments to co-counsel, William Hames.

23  Even if Dr. and Mrs. Bertelsen were entitled to recovery under a fee

24  disgorgement theory for alleged breach of fiduciary duty, they are

25  only entitled to, at most, the attorney fees which Mr. Harris

26  ///

received, not the payment for expenses that were paid to third parties.

11.  Since Dr. and Mrs. Bertelsen have not proven egregious misconduct by Mr. Harris or his law firm warranting fee disgorgement, it is unnecessary for this court to determine which portion of the expenses paid to third parties should be subtracted from the total $45,000 claimed by Dr. and Mrs. Bertelsen.

12.  Mr. Harris did not breach the standard of care in his representation of the Bertelsen family members in the ARCO lawsuit. The assertion of the PMPA preemption defense involved the exercise of informed judgment.  The plaintiffs have failed to show any damages were proximately caused by any conduct of Mr. Harris or his law firm in asserting the PMPA preemption defense in the ARCO lawsuit.

13.  Jeff and Amy Bertelsen are the only plaintiffs asserting a CPA claim.   (This court has already dismissed any CPA claims by Dr. and Mrs. Bertelsen.)  They have not shown any unfair or deceptive billing conduct by Mr. Harris.  Plaintiffs Jeff and Amy Bertelsen have also failed to prove that the various fee agreements impacted the public interest.  Thus, plaintiffs have not satisfied the requirements of RCW 19.86.090 and therefore Jeff and Amy Bertelsen, as well as Bertelsen Food & Gas, are not entitled to any recovery under the CPA.

14.  Judgment shall be entered in favor of defendants Harris, as well as the law firm, Harris Berne Christensen, on all claims asserted by all plaintiffs.

///

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

The foregoing Findings of Fact and Conclusions of Law are herewith supplemented by the oral decision of the Court read into the record on October 13, 2006, and the Supplemental Memorandum Opinion dated October 23, 2006, which are by reference thereto incorporated with the foregoing Findings of Fact and Conclusions of Law.  The Clerk of the Court shall enter judgment for the Defendants.

DATED this 23rd day of October, 2006,

*s/Lonny R. Suko*
_____
LONNY R. SUKO
UNITED STATES DISTRICT JUDGE

17 - **FINDINGS OF FACT AND CONCLUSIONS OF LAW**